UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Angela M. | Case No. 18-cv-1258 (SER) |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks review of the Acting Commissioner of Social Security's (the "Commissioner") denial of her application for disability insurance benefits ("DIB"). (ECF No. 4). The parties filed cross-motions for summary judgment. (ECF Nos. 15, 17). For the reasons set forth below, the Court denies Plaintiff's motion and grants the Commissioner's motion.

I. **BACKGROUND**

A. **Procedural History**

Plaintiff filed for DIB on June 11, 2014, citing an alleged onset date of October 26, 2013. (Admin. R. at 98, 112, 117, ECF No. 14). Plaintiff alleged disability due to impairments of obesity, generalized anxiety with elements of panic, sleep apnea, carotid artery dissection, chronic headaches and migraines, fibromyalgia, Reynaud's disease, anemia, chronic subjective dizziness, restless leg syndrome, vasovagal syncope episodes,

1

somatization disorder, irritable bowel syndrome, acid reflux, ADHD, major depressive order, and residual traumatic stress. (Admin. R. at 98–99, 102, 112–13). Plaintiff's claims were denied initially and upon reconsideration. (Admin. R. at 3, 12). Following a hearing, the administrative law judge (the "ALJ") denied benefits to Plaintiff on March 29, 2017. (Admin. R. at 25). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision final. (Admin. R. at 7). Plaintiff then initiated the instant lawsuit. (ECF No. 4).

B.  **Factual Background**

The Court reviewed the entire Administrative Record but summarizes only the evidence necessary to determine the issues before the Court.

1.  **Migraines**

Plaintiff has a long history of migraine headaches, beginning from age sixteen. (Admin. R. at 690). In March 1991, she underwent a resection of the left C1 lesion which proved to be a schwannoma.[1] (Admin. R. at 690). Between 1991 and 2015, Plaintiff had difficulty controlling her migraines and was on a variety of medications.[2] (Admin. R. at 690). In June 2010, the headache pattern changed and was associated with light and noise sensitivity as well as nausea. (Admin. R. at 690). She tried different medications but her

---

[1] "A schwannoma is a type of nerve tumor of the nerve sheath . . . Schwannomas are rarely cancerous, but they can lead to nerve damage and loss of muscle control." *Schwannoma*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/schwannoma/cdc-20352974 (Mar. 08, 2018).

[2] The medications listed are nortriptyline, amitriptyline, verapamil, propranolol, topiramate, valproic acid, and nadolol. (Admin. R. at 690). The Court finds it unnecessary to delve into the medications because they do not affect the Court's analysis.

headaches persisted. (Admin. R. at 690). In September 2010, Plaintiff's neurological exam showed right Horner syndrome but was otherwise normal.[3] (Admin. R. at 690). In January 2011, her condition improved as she had three or four headaches per month instead of a daily, continuous headache. (Admin. R. at 691). By May 2011, her headaches were under reasonably good control. (Admin. R. at 691).

In September 2011, Plaintiff's headaches became more severe. (Admin. R. at 691). She had one headache lasting three days that caused her to take nine days off work and school. (Admin. R. at 691). She had an MRI and MRA of her head in the emergency room but neither showed any abnormalities. (Admin. R. at 691). In October 2011, she was experiencing a "continuous daily 'dull headache'" with cervical and trapezius muscle pain. (Admin. R. at 691). Her neurological exam was normal and her doctor noted "good strength and reflexes," a normal gait, normal sensory exam, no muscle tenderness, but "limited volitional motor mobility of her neck and tenderness in both trapezius muscles." (Admin. R. at 691). Plaintiff's doctor recommended a physiatrist. (Admin. R. at 691).

In January 2012, Plaintiff continued to have neck pain radiating into her trapezius muscles and experienced pain in her right thigh and arm. (Admin. R. at 691). She also experienced imbalance and disequilibrium. (Admin. R. at 691). She had a normal neurological exam, aside from the partial right Horner syndrome which was long-standing.

---

[3] Horner syndrome is "caused by the disruption of a nerve pathway from the brain to the face and eye on one side of the body." *Horner Syndrome*, MAYO CLINIC https://www.mayoclinic.org/diseases-conditions/horner-syndrome/symptoms-causes/syc-20373547 (May 11, 2018). This "results in a decreased pupil size, a drooping eyelid and decreased sweating on the affected side of your face." *Id.*

(Admin. R. at 691). Plaintiff's doctor noted "multiple tender points in the cervical and lumbar paraspinal muscles as well as the limbs." (Admin. R. at 691). Her doctor recommended a visit to a fibromyalgia clinic along with a visit to a vestibular lab and a behavioral psychology clinic. (Admin. R. at 691). Plaintiff visited a vestibular lab, had a normal vestibular evaluation, and participated in vestibular rehab which she found helpful. (Admin. R. at 691–92). She also went to the Fibromyalgia Clinic but there are no notes on whether that was helpful. (*See* Admin. R. at 692).

In August 2012, Plaintiff was "virtually headache-free." (Admin. R. at 692). In March 2013, she had a particularly severe headache. (Admin. R. at 692). In May 2013, Plaintiff experienced daily headaches again but her neurological exam was normal. (Admin. R. at 692).

In October of 2014, Plaintiff went to the doctor with complaints of a headache after fainting. (Admin. R. at 506–07). In the same month, she also had a CT scan of her head which did not show any hemorrhage, lesion, or infarction and only reflected changes from her earlier craniotomy. (Admin. R. at 520). Similarly, Plaintiff had an MRI scan of her head showing no acute intracranial abnormality. (Admin. R. at 405–09). Plaintiff's doctor recommended Botox injections to help with the headaches but Plaintiff testified she declined to try the Botox because the injections seemed "riskier." (Admin. R. at 51–52, 496, 516).

In February 2015, she had a normal neurological exam but continued to have headaches. (Admin. R. at 692). Plaintiff fell behind in her college courses because of her headaches. (Admin. R. at 692). In September of 2016, Plaintiff experienced headaches

three to five days a week, which caused her to miss work as a receptionist. (Admin. R. at 692).

## 2. Plaintiff's Medical Providers

Dr. Beithon was Plaintiff's primary care physician and opined Plaintiff's impairments, including Plaintiff's headaches and other physical ailments, would preclude her from performing basic work activities and would require unscheduled breaks during an eight-hour day. (Admin. R. at 338). Dr. Beithon also opined Plaintiff would miss four or more workdays a month and would likely be off task for 25% of the time or more. (Admin. R. at 339).

Ken Little was one of Plaintiff's therapists and treated her between 2009 and 2014. (Admin. R. at 452). He opined Plaintiff was unable to meet competitive standards and had no useful ability to function on most mental abilities and aptitudes needed to work. (Admin. R. at 454–55). Little stated Plaintiff could only handle simple tasks in short segments and noted a number of physical symptoms in his findings such as fibromyalgia pain and frequent, incapacitating pain. (Admin. R. at 455–56). Little reported Plaintiff had problems managing daily routines and fell behind in her college classes because of her anxiety and mental state. (Admin. R. at 457–59). Little opined Plaintiff would miss more than four days a month of work because of her physical and mental impairments. (Admin. R. at 456).

Dr. Hal Baumchen, another therapist, evaluated Plaintiff for psychological difficulties and depression. (Admin. R. at 747). In a December 2013 report, he stated Plaintiff had severe depression, signs of emotional distress, poor concentration, post-

traumatic stress nightmares and flashbacks, difficulties in concentration and attention, negative expectations, and confusion. (Admin. R. at 747–52).

Greg Walsh, a licensed social worker, also saw Plaintiff for mental health treatment. (Admin. R. at 755–59). Walsh opined that Plaintiff did not have the limited abilities or aptitudes necessary for unskilled or skilled work. (Admin. R. at 757–58). Walsh stated Plaintiff would miss more than four days of work per month because of her impairments. (Admin. R. at 759).

### 3. Other Conditions

Plaintiff was treated for restless leg syndrome, sleep apnea, and narcolepsy. (Admin. R. at 335–36, 370). Plaintiff was also diagnosed with Barett's esophagus, which caused gastrointestinal pain and diarrhea. (Admin. R. at 439, 495). The Court does not go into detail on these conditions because they are not at issue in the instant motion.

### C. The ALJ's Decision

Consistent with the Social Security Administration's regulations, the ALJ conducted the five-step eligibility analysis. (Admin. R. at 10–22); *see also* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (Admin. R. at 17). At step two, the ALJ found Plaintiff had the severe impairments of obesity, obstructive sleep apnea, migraine headaches, a history of right internal carotid artery dissection in 2010, and fibromyalgia with myofascial pain. (Admin. R. at 17–18). The ALJ did not find Plaintiff's mental impairments to be severe because they did not cause more than a minimal limitation in her ability to perform basic mental work activities. (Admin. R. at 18).

At step three, the ALJ considered Listing 11.02 for epilepsy and altered awareness but stated Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity [of the Listing]." (Admin. R. at 20).[4] The ALJ found Plaintiff to have the residual functional capacity ("RFC") "to perform light work . . . which does not involve work at unprotected heights or near hazards." (Admin. R. at 21). At step four, the ALJ found Plaintiff capable of performing past relevant work as an order clerk because this "work did not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Admin. R. at 24). The ALJ thus concluded Plaintiff was not disabled. (Admin. R. at 25).

## II. DISCUSSION

### A. Legal Standard

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by substantial evidence in the record as a whole." *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (internal quotation marks omitted). The Court's task is limited "to review[ing] the record for legal error and to ensur[ing] that the factual findings are supported by substantial evidence." *Id.* This Court must "consider evidence that detracts

---

[4] The ALJ also considered Plaintiff's obesity using the criteria of the musculoskeletal, respiratory, digestive, and cardiovascular impairments under Listings 1.00Q, 3.00I, and 4.00F; Plaintiff's fibromyalgia under Listing 11.09 for multiple sclerosis and Listing 1.02 for the musculoskeletal system; Plaintiff's sleep-apnea under Listing 3.02 for sleep-related breathing disorders; and Plaintiff's digestive problems under Listing 5.06 for inflammatory bowel disease. (Admin. R. at 20–21). The parties do not challenge the ALJ's findings with respect to these listings.

from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). A court cannot reweigh the evidence or "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [a court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

### B. Analysis

Plaintiff argues that the ALJ erred in evaluating whether Listing 11.02 was equaled, that the ALJ's analysis of Plaintiff's headaches was flawed, the ALJ erred in rejecting the opinion of Dr. Beithon, the ALJ's subjective symptom analysis was flawed, and the ALJ erred in evaluating Plaintiff's mental impairments. The Court addresses each argument in turn.

#### 1. Listing 11.02

Plaintiff argues the ALJ erred in evaluating whether Plaintiff's impairments met or medically equaled Listing 11.02 for neurological impairments. Plaintiff asserts the Social Security Agency's policy recognizes that migraines are similar in nature to epilepsy—which the ALJ noted—and that Plaintiff has a long history of severe headaches and migraines. Plaintiff also claims the ALJ only considered Listing 11.02(D) even though there are three other ways to meet that listing.

Plaintiff correctly notes that the ALJ did not reference two subsections—Listings 11.02(A) or 11.02(C). Both involve "a loss of consciousness *and* violent muscle contractions," with 11.02(A) requiring them at least once a month for at least three consecutive months and 11.02(C) requiring them at least once every two months for at least

four consecutive months. 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.02 (emphasis added). While the ALJ did not analyze whether Plaintiff experienced these symptoms, the Court does not find any instances in the record where Plaintiff experienced "a loss of consciousness and violent muscle contractions." The record only shows one instance where Plaintiff fell unconscious from her migraines. (Admin. R. at 506–07). This single episode does not fit the frequency required in either 11.02(A) or 11.02(C). The record is devoid of any instances where Plaintiff experienced violent muscle contractions, let alone any violent muscle contractions in relation to a loss of consciousness. Therefore, even though the ALJ did not specifically analyze Plaintiff's conditions for Listings 11.02(A) or 11.02(C), the Court finds the ALJ did not err in finding Plaintiff did not meet Listings 11.02(A) or 11.02(C) because the record as a whole supports the ALJ's determination. *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) ("As a general rule, we have held that an ALJ's failure to adequately explain his factual findings is not a sufficient reason for setting aside an administrative finding where the record supports the overall determination." (internal quotation marks omitted)).

Plaintiff incorrectly asserts the ALJ did not consider Listing 11.02(B). The ALJ expressly referenced 11.02(B) and 11.02(D) when she stated:

> The listing provides for a frequency of dyscognitive seizures occurring once weekly for three consecutive months while following prescribed treatment [referencing 11.02(B)], or occurring at least once every two weeks for at least 3 consecutive months despite adherence to prescribed treatment AND marked limitation in physical functioning or understanding, remembering or applying information or interacting with others or concentrating, persisting or maintaining pain, or managing oneself [referencing 11.02(D)].

(Admin. R. at 20). The language used by the ALJ mirrors that found in the listings and shows that the ALJ in fact considered both Listings 11.02(B) and 11.02(D).

While the ALJ did not discuss the medical evidence related to Plaintiff's migraines at step three, she discussed it at length later in her opinion. The ALJ pointed to multiple instances in the record to support her finding that the record is "inconsistent with the degree of limitation alleged by the claimant." (Admin. R. at 22). The ALJ noted Plaintiff's schwannoma in 1991 and her history of right internal carotid artery dissection in 2010. (Admin. R. at 22, 681). But the ALJ explained that the "evaluations from the relevant period include an October 24, 2014 CT scan of the head, which failed to show any hemorrhage, lesion or infarction and only indicated post-operative changes from the earlier craniotomy, and MRI scan of the head showing no acute intracranial abnormality." (Admin. R. at 22, 405–09, 520). The ALJ also discussed how Plaintiff "was not observed with headaches at the severity reported during the relevant period." (Admin. R. at 22). The ALJ cited to a host of evidence in the record including numerous occasions where Plaintiff was not observed in acute distress, the lack of emergency room visits or the use of strong medication for Plaintiff's headaches during the relevant period, and multiple normal neurological exams. (Admin. R. at 22–23, 347, 352, 357, 361, 369, 373, 514–15). While Plaintiff asserts there is a host of evidence to support that Listing 11.02 was medically equaled, the Court cannot "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion . . . ." *Harwood*, 186 F.3d at 1042. The Court therefore finds the ALJ did not err in determining Plaintiff did not

meet the Listing because substantial evidence in the record supports the ALJ's determination.

Plaintiff also claims Social Security Ruling 96-6p requires the ALJ to obtain medical expert testimony to give an updated opinion on whether Plaintiff meets Listing 11.02. An updated opinion is only required when the ALJ believes the evidence suggests a finding of equivalence or when additional medical evidence is received that may change the state agency medical consultant's finding that the impairment is not equivalent to a listing. SSR 96-6P, 1996 WL 374180. Here, neither situation applies. No new medical evidence during the relevant period entered the record after the state medical consultants issued their opinions and the ALJ's conclusions did not suggest a finding of medical equivalence.

In sum, the Court finds the ALJ did not err in finding that Plaintiff did not meet Listing 11.02 because substantial evidence in the record supports the ALJ's determination.

### 2. Plaintiff's Migraines

Plaintiff argues the ALJ's analysis of her migraines is flawed because the ALJ did not properly consider all the medical evidence on the record. Plaintiff first argues the ALJ failed to address Dr. Beithon's treatment note that Plaintiff's 2010 dissection restricted effective migraine treatment. Plaintiff is mistaken. The ALJ acknowledged Plaintiff's 2010 dissection, and stated the evaluations from the relevant period did not show any brain hemorrhages, lesions, or any other abnormalities. (Admin. R. at 22). Plaintiff also claims the ALJ did not review Dr. Beithon's medical notes on how treating Plaintiff's migraines with medication was difficult due to her depression, anxiety, and chronic fatigue. Contrary

to Plaintiff's assertion, the ALJ discussed Dr. Beithon's treatment notes throughout her decision. For example, the ALJ expressly discusses and cites Dr. Beithon's notes on Plaintiff's migraines from November 2013, December 2013, January 2014, and December 2014. (Admin. R. at 22–23).

Plaintiff next argues the ALJ did not explain why she rejected Plaintiff's limitations from her headaches and migraines. Plaintiff claims anyone with her frequency and severity of headaches would be unable to engage in substantial gainful activity. As discussed above, the ALJ described numerous evaluations and medical treatment notes from the relevant period that did not show any brain abnormalities or note Plaintiff in acute distress from her headaches. (Admin. R. at 22–23, 347, 352, 357, 361, 369, 373, 405–09, 514–15, 520). The ALJ therefore did not err in discounting Plaintiff's subjective complaints of pain when the medical records did not support Plaintiff's allegations of the frequency and severity of her headaches. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

Plaintiff also argues the ALJ erred in noting Plaintiff declined recommended Botox treatment. Plaintiff contends she rejected Botox treatment due to fear of its side effects. Plaintiff does not cite any legal authority on why the ALJ erred by noting declined recommended medical treatment. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) ("[A] failure to seek treatment may indicate the relative seriousness of a medical problem."). Nor does Plaintiff explain how omitting this detail would have changed the outcome in this case. *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently . . . and any error by the ALJ

12

was therefore harmless."). Regardless, even if the ALJ erred in noting Plaintiff declined recommended Botox treatment, the ALJ listed a host of other evidence in the record in concluding that the frequency of headaches reported by Plaintiff was not corroborated. (*See* Admin. R. at 22–23).

### 3. Dr. Beithon's Opinion

Plaintiff contends the ALJ improperly rejected the opinion of her treating physician, Dr. Beithon, in favor of the agency's non-treating physicians. Dr. Beithon assessed significant restrictions for Plaintiff. For instance, Dr. Beithon opined Plaintiff was precluded from performing basic work activities and would require unscheduled breaks during an eight-hour workday. (Admin. R. at 338). Dr. Beithon also opined Plaintiff would miss four or more workdays per month and would likely be off task for 25% of the time or more. (Admin. R. at 339).

A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

The Court finds the ALJ gave ample reason to discount Dr. Beithon's opinion. For instance, the ALJ discussed how Dr. Beithon did not note Plaintiff as being in acute distress on numerous occasions Dr. Beithon saw Plaintiff. (Admin. R. at 22; *see e.g.*, 357, 365, 369,

13

373, 377). The ALJ also pointed to the lack of emergency room visits related to headaches during the relevant period and the lack of strong medication for headaches. (Admin. R. at 23). The ALJ went on to point out that Plaintiff's neurological exams and MRIs showed no brain abnormalities. (Admin. R. at 22–23, 347, 352, 357, 361, 369, 373, 514–15). Accordingly, the ALJ did not err in discounting Dr. Beithon's opinion because Dr. Beithon's assessment of Plaintiff's headaches was inconsistent with the record.

Plaintiff also claims the ALJ improperly weighed the state agency medical physicians, who had not examined Plaintiff, over Dr. Beithon. The Eighth Circuit Court of Appeals noted two exceptions to the rule when consultative physicians' opinions do not constitute substantial evidence: (1) when "other medical assessments are supported by better or more thorough medical evidence," or (2) when a treating physician offers inconsistent opinions. *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (internal quotations and citations omitted). As explained above, this case falls within the second exception. Under these circumstances, the ALJ may give "great weight to the opinions of state agency medical consultants because they are generally supported by the record, were made by individual[s] familiar with the disability evaluation process, and new records submitted since the time of those reviews does not support greater restrictions." (Admin. R. at 24). Thus, the ALJ properly weighed and considered Dr. Beithon's opinions and the state agency physicians' opinions.

### 4. Plaintiff's Subjective Symptoms

Plaintiff argues the ALJ failed to adequately consider her subjective symptoms and did not articulate reasons for rejecting Plaintiff's evidence of her disability. The ALJ found

14

that Plaintiff's daily living activities are consistent with her finding that Plaintiff had an RFC allowing her to perform her past relevant work as an order clerk. (Admin. R. at 24). While an ALJ "is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations, [s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (1984) (emphasis added).

Here, the ALJ properly considered Plaintiff's subjective complaints in light of the record as a whole. Plaintiff "reported daily activities including washing dishes, cleaning, grocery shopping, simple cooking, loading the washer and dryer, driving, paying bills, and watching television." (Admin. R. at 24, 51, 250–52). Plaintiff drove her children to school and to appointments, attended parent-teacher conferences for her children, and took online college courses. (Admin. R. at 24, 36, 49, 692). Plaintiff also represented herself in child-custody litigation. (Admin. R. at 24, 708). The ALJ cited to substantial evidence in the record to support her determination that Plaintiff had an RFC that allowed her to perform her past work. Because the ALJ discussed the inconsistencies in the record upon which she relied in discrediting Plaintiff's subjective complaints, the ALJ's analysis of Plaintiff's subjective symptoms was not flawed.

### 5. Plaintiff's Mental Impairments

Finally, Plaintiff claims the ALJ erred in evaluating Plaintiff's mental health issues by rejecting the medical opinions of Mr. Little, Dr. Baumchen, Mr. Walsh, and the state agency physicians. "Medical opinions of a treating physician are normally accorded substantial weight." *Singh*, 222 F.3d at 452. "However, medical opinions must be

supported by acceptable medical evidence and must not be inconsistent with other evidence on the record as a whole." *Dixon v. Barnhart*, 353 F.3d 602, 606 (8th Cir. 2003).

Ken Little, a therapist, opined Plaintiff was unable to meet competitive standards and had no useful ability to function on most mental abilities and aptitudes needed to work. (Admin. R. at 455). The ALJ noted that Plaintiff's ability to go to court without an attorney for child custody proceedings was "inconsistent with more than mild limitations from her mental impairments." (Admin. R. at 19, 708). Little also opined Plaintiff could only handle simple tasks in short segments. (Admin. R. at 455). The ALJ gave no weight to this opinion "because the findings cited, such as memory loss, speech problems, needing supervision to stay on task, stress tolerance, and problems with concentration and speaking in groups, are not reflected in [Little's] own treatment notes or supported by the treatment notes of Dr. Silas or the results of the neuropsychological testing." (Admin. R. at 19; *see also* Admin. R. at 452–56). Similarly, the ALJ discounted the physical impairments Little assessed for Plaintiff, such as frequent pain and fibromyalgia pain, because, as a mental health clinician, Little was not qualified to assess these. (Admin. R. at 19, 455). Finally, the ALJ discounted Little's opinion on Plaintiff's frequency of missing work because Little did not provide a basis for his opinion. (Admin. R. at 19); *see also* Admin. R. at 452–56). The Court finds that substantial evidence supports the ALJ's determination that Little's evaluation of Plaintiff was inconsistent with the record as a whole.

Dr. Hal Baumchen, another therapist, opined Plaintiff had severe depression and poor concentration. (Admin. R. at 750). Yet, in the same report, Dr. Baumchen noted Plaintiff had appropriate affect, logical thinking, appropriate thought content, fair social

16

judgment, was cooperative, and had "no gross behavioral abnormalities." (Admin. R. at 750). Dr. Baumchen also noted "[t]here is a significant probability that she [Plaintiff] has endorsed the items [on the psychological evaluation] inaccurately by reporting more symptoms and behaviors than seen in most psychiatric patients." (Admin. R. at 750). At a different evaluation by Dr. Cohen two months later, Plaintiff was also noted to have average scores on testing of attention. (Admin. R. at 19, 790). The Court finds that substantial evidence supports the ALJ's determination that Dr. Baumchen's evaluation of Plaintiff was inconsistent with the record as a whole.

Greg Walsh, a licensed social worker, opined Plaintiff would miss four days of work per month and would be off task twenty-five percent of the time. (Admin. R. at 18–20, 339, 759). Yet, Dr. Beithon, Plaintiff's primary care provider, "failed to document any observed limitations from the mental impairments during the relevant period." (Admin. R. at 19). Indeed, Plaintiff did not display any signs of acute distress and displayed normal mood and affect on every occasion during the relevant time period. (Admin. R. at 19; *see e.g.*, 357, 365, 369, 373, 377). The Court finds that substantial evidence supports the ALJ's determination that Walsh's evaluation of Plaintiff was inconsistent with the record as a whole.

The state agency psychological consultant stated Plaintiff's mood disorder and anxiety may sometimes impact her ability to concentrate and effectively relate to others. (Admin. R. at 123). But this same consultant noted "the totality of the evidence indicates that the claimant has the ability to complete simple repetitive tasks, on a sustained basis, in a low demand setting in which they do not have to make frequent work related decisions,

or to adapt to frequent changes in the work setting." (Admin. R. at 123). The state psychological consultant's report was inconsistent and, as the ALJ noted, these findings were "made without the benefit of neuropsychological testing." (Admin. R. at 20). Furthermore, Plaintiff's mental capacity assessments during the relevant time showed few limitations. For instance, a 2014 assessment showed Plaintiff was not significantly limited in her ability to carry out short and simple instructions, maintain attention and concentration for extended periods, maintain regular attendance, sustain an ordinary routine without supervision, work in coordination with others, and make simple-work related decisions. (Admin. R. at 107–08). The only limitations noted were moderate limitations to carry out detailed instructions and to complete a normal workday because Plaintiff's mood disorder may at times impact her ability to concentrate and relate to others. (Admin. R. at 107–08). The Court finds that substantial evidence supports the ALJ's determination that the state agency psychology consultants' evaluation of Plaintiff was inconsistent with the record as a whole.

Even if the ALJ should have credited one of the medical opinions and found Plaintiff's mental impairments severe, Plaintiff has not shown reversible harm from the ALJ's alleged error. To show that an error was not harmless, Plaintiff "must provide some indication that the ALJ would have decided differently if the error had not occurred." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). Here, even if the ALJ had found Plaintiff's mental impairments severe, the ALJ would have still found Plaintiff not disabled at step four because the ALJ found Plaintiff could perform her past work. (Admin. R. at 24–25). The Court therefore rejects Plaintiff's assertions of error.

## III. CONCLUSION

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Angela M.'s Motion for Summary Judgement (ECF No. 15) be **DENIED**; and

2. The Acting Commissioner of Social Security's Motion for Summary Judgment (ECF No. 17) be **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 5, 2019

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge